

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-08-131-CR

TARRENCE LAMONE STEVENSON                          APPELLANT

V.

THE STATE OF TEXAS                                        STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

------------

## OPINION

------------

## I. Introduction

In four issues, Appellant Tarrence Lamone Stevenson appeals his murder conviction and life sentence.  We affirm.

## II.  Procedural Background

The State charged Stevenson with the capital murder of Syed Karim, who was shot during the course of a convenience store robbery.  Stevenson pleaded not guilty.  A jury found him guilty of murder and sentenced him to confinement for life, and the trial court entered judgment on that verdict.  This appeal followed.[1]

## III.  Sufficiency of the Evidence

In his first issue, Stevenson complains that the evidence is legally and factually insufficient to convict him of murder.

As an initial matter, the State contends that Stevenson forfeited this complaint because he did not object to the submission of murder as a lesser-included offense and accepted the benefits of that charge.  To support its argument, the State refers us to *State v. Lee*, 818 S.W.2d 778, 781 (Tex. Crim. App. 1991), and *Bradley v. State*, 688 S.W.2d 847, 853 (Tex. Crim. App. 1985), both of which the State acknowledges were overruled on other grounds by *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998).

---

[1] Because Stevenson challenges the legal and factual sufficiency of the evidence to sustain his murder conviction, we will review the facts of this case in greater detail below.

Stevenson has not forfeited this complaint. In *McKinney v. State*, the

court of criminal appeals addressed *Bradley* and *Lee*, stating:

> [b]ecause the concern is ensuring that the essential elements of the
> offense are proven beyond a reasonable doubt, it makes little sense
> to preclude a defendant from challenging the legal sufficiency of
> the evidence on appeal simply because he requested and received
> an instruction on a lesser-included offense. Likewise, it makes little
> sense to extend the estoppel rule to preclude a defendant from
> challenging the factual sufficiency of the evidence.
>
> Thus, we hold that the estoppel rule will not be applied to all
> criminal cases where the legal sufficiency of the evidence is
> challenged and a lesser-included offense instruction is requested
> and received, nor should the rule be extended to preclude
> challenges to factual sufficiency. *On the contrary, application of
> this estoppel rule should be confined exclusively to the limited
> number of cases that challenge the sufficiency of the evidence as
> it relates to the sudden-passion element of voluntary manslaughter
> and that arose before September 1, 1994*.

207 S.W.3d 366, 374 (Tex. Crim. App. 2006) (emphasis added).[2]

A. Standards of Review

In reviewing the legal sufficiency of the evidence to support a conviction,

we view all of the evidence in the light most favorable to the prosecution in

order to determine whether any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt. *Jackson v.*

---

[2] The State also refers us to *Otting v. State*, 8 S.W.3d 681, 686–87
(Tex. App.—Austin 1999, pet. ref'd, untimely filed), which involved the
estoppel rule as applied to factual sufficiency. Per *McKinney*, it is inapposite.
*See* 207 S.W.3d at 374.

*Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Furthermore, we must consider all the evidence admitted at trial, even improperly admitted evidence, when performing a legal sufficiency review. *Clayton*, 235 S.W.3d at 778; *Moff v. State,* 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004). The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing an actor's guilt. *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Steadman*, 280 S.W.3d at 246; *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of

4

all the evidence, although legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

Unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); *see Steadman*, 280 S.W.3d at 246. Evidence is always factually sufficient when it preponderates in favor of the conviction. *Steadman*, 280 S.W.3d at 247; *see Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Watson*, 204 S.W.3d at 417. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id.* We may not simply substitute our judgment for the factfinder's. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution

5

of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Our deference in this regard safeguards the defendant's right to a trial by jury. *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008). A factual sufficiency review of circumstantial evidence is the same as a review of direct evidence. *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000); *Kutzner v. State*, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999) (reasoning that "[c]ircumstantial evidence, by itself, may be enough to support the jury's verdict").

B. Murder

The jury convicted Stevenson of felony murder. *See* Tex. Penal Code Ann. § 19.02(b)(3) (Vernon 2003). The indictment charged him with intentionally causing the death of Sayed Karim by shooting him with a firearm during the course of committing or attempting to commit the offense of robbery—that is, capital murder. *See id.* § 19.03(a)(2) (Vernon Supp. 2009). Murder is a lesser-included offense of capital murder, and a lesser-included offense instruction on felony murder was included in the trial court's charge to the jury, as well as an instruction on the law of parties. *Id.* § 7.01 (Vernon 2003), §§ 19.02(b)(3), 19.03(c). A person commits felony murder if he commits or attempts to commit a felony (i.e., robbery) and, in the course of and

6

in furtherance of the commission or attempt, or in immediate flight therefrom, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual. *Id.* § 19.02(b)(3). Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a).

C. Evidence at Trial

    1. Crime Scene

        a. The Shooting

The murder of Sayed Karim occurred on the night of April 13, 2005, at Terry's Food Mart on Hemphill Road in Fort Worth. Patrick Kilpatrick and his wife, Brenda,[3] testified that they stopped at the store around 10:20 p.m. so that Patrick could talk with Karim about a used big screen television that Karim wanted to purchase. While Patrick and Karim talked at the counter, Brenda went to get herself a Pepsi and a six-pack of beer for Patrick.

As Brenda started to pay for their beverages, two black men entered the store and one screamed, "This is a robbery, fools!" Patrick described the two men as wearing black clothing—hooded sweatshirts and ski-type masks "like

---

[3]... Both testified that they had spent time in prison. The last time Patrick was in trouble with the law was in 1991; Brenda's last time was in 1987.

those insurgents [in Iraq]." Brenda testified that all she could see were their eyes. The shorter man, standing in front of Karim, had a gun. The taller man stood facing the door on the opposite side of the store, by the beer cooler. Patrick and Brenda both testified that there was also a third man in the store, a young black male who was not wearing a mask, had hair in braids with beads, wore a Cleveland Browns football jersey, and did not appear to them to be involved in the robbery. Patrick testified that Stevenson was not the young man with the braids.

Brenda testified that at the gunman's order Karim immediately opened the cash register, pulled out the till, and threw it on the counter. Patrick testified that Karim pleaded for his life after he put the cash drawer on the counter, but the gunman demanded more. Brenda backed away, ran into a store employee, and got behind one of the aisles—she used the employee's cell phone to call 911. Patrick got behind one of the other aisles and used his cell phone to call 911.

Brenda testified that she did not see Karim get shot but that she saw him stagger from behind the counter after the gunman shot him and that he was holding his side and "there was blood everywhere." Patrick testified that Karim yelled for someone to call 911 and then fell to the floor. Karim actually managed to call 911 himself.

8

Grant Fredericks, a forensic video analysis expert, testified that he overlaid the 911 calls onto the surveillance videotape and developed powerpoint slides from the video images. Fredericks played the videotape with the three 911 calls for the jury, describing the events as follows:

- The first male enters at 10:40:42 p.m. and retrieves something from the cooler. He has "little reflective events in his hair." He is taller than five feet, eight inches "probably by several inches."

- The second male enters twenty seconds later, at 10:41:03. He is significantly shorter than the other two males. At 10:42:09, he is in front of the counter and moves an object in his right hand pointed directly at the clerk—"as we follow and track this object, it's obviously the gun and it's eventually fired."

- The third male enters behind the second male. Both the second and third males are wearing things that cover their heads.

- At 10:41:50, Karim pulls the cash drawer out. The shot is fired at 10:41:53.

- After the second male fires the shot, he disappears from the camera's view. The first male reaches on the counter and appears to sweep the objects, the money that remained on the counter, off the counter and follows the second male.

   b.  The Escape

Gabriel Rojas testified that he witnessed the shooting from inside his car—he had driven to the convenience store to pick up some things for his grandfather and saw a man dressed all in black emerge from the store. Then, as he pulled in, he saw another man, wearing a black, hooded sweater, pointing

9

a gun at the clerk. He then backed his car up, heard a gunshot, and pulled into the Shell gas station next door, where he saw a black car—what he thought was a four-door Toyota Camry—parked next to the car wash. He saw a man with a black hood run towards the passenger side and get inside the vehicle. He testified that there had been three men in black: the one who left, wearing a sweater; one in the back of the store next to the beer cooler; and the one with the gun.

Kristen Pyles testified that she stopped at the Shell station and saw a parked, dark-colored, four-door car, which she described as "an older Honda or something." She testified that she almost hit two men running to the vehicle—they were wearing dark-colored hoodies and at least one had a mask on. Both entered the dark car—one into the front passenger side and one into the back passenger side. She testified that the one that entered the front passenger seat looked like he was carrying a case of beer or box of some sort.

Detective Pat Henz testified that he arrived at the crime scene around 11:25 p.m. He took photos and located and collected a fired shell casing and a fired bullet projectile; he was with one of the other detectives who collected

the surveillance videotapes. He testified that he found no fingerprints of any value.[4] He returned to the scene a few months later to take additional photos.

## 2. Other Evidence

Detective Jose Hernandez testified that various tips led to Amanda Bivins and her car, a black 1998 four-door Oldsmobile Cutlass, and to the three men who were arrested: Stevenson, Darrell "Boo" Bell, and Julian Hayley. He testified that Stevenson was five feet, seven inches and 150 pounds; Hayley was five feet, nine inches and 140–150 pounds; and Bell was five feet, ten inches and 160 pounds.

Bivins testified that in 2005, she used crack cocaine and would "basically rent [to Bell her] car in exchange for the drugs." She knew Hayley, Stevenson, and Lloyd "Twin" Meredith through Bell—all three lived near Bell—and she took drugs with Meredith. On April 13, 2005, when it was getting dark, she and Bell went to a house on Bandy Avenue; Bell drove her car. She waited in the car while Bell went inside. He emerged with Stevenson and Hayley—they were all wearing black—and Bell got back into the driver's seat. Hayley and

---

[4] He testified on cross-examination that he did not collect the Pepsi bottle that had spilled onto the floor, or the paper towels nearby, or any shoe imprints, and that he did not fingerprint the Pepsi bottle.

11

Stevenson climbed into the back seat; Bell tossed a black handgun into Bivins's lap and said, "Here, hold this."

Bivins testified that she asked whether the gun was loaded and Stevenson told her that the gun had a bullet in the chamber. When she asked if anyone was going to get shot, he told her no—it was "just in case." She testified that she knew they planned to rob a store, but she did not know which one—she stayed at Meredith's house and they took her car. Her concern at the time was that they were "probably fixing to get money and that [she] would be able to get high."

Bivins testified that Bell returned her car around thirty minutes later and that it was followed by a light-colored Lincoln Town Car. A cash register till was in the front seat of her car and a black sweat shirt was in the back seat. Bell gave her $20 and then left in the Lincoln. Bivins pulled her car into Meredith's driveway, and Meredith, with gloves on, got the cash register till, a sweat shirt, and a ski mask out of her car and placed them in the trash. Then Bivins went driving around to look for Bell because she wanted more money or drugs, but she did not find him that night.

Instead, Bivins saw Stevenson in front of the house on Bandy Avenue, by the Lincoln or in the Lincoln, a couple of hours later and asked him where they had gone. He told her, "Terry's Food Mart on Hemphill." When she asked if

12

anyone had been shot, he told her that he shot at somebody "to scare them, but [he] didn't shoot anybody." The next day, she saw on television a report that Terry's Food Mart had been robbed and that a man had been murdered.

Five days later, the police pulled over her car—Shawntee Abbs and two others were with her. Bivins identified Bell, Stevenson, and Hayley in photo lineups. Bell wore his hair in braids at the time. Bivins testified that the police who interviewed her brought up Bell's, Hayley's, and Stevenson's names and "knew quite a bit" about what had happened. She gave consent to search her vehicle, even though she knew they would find illegal narcotics in it, and she gave a statement. She testified that she received an immunity agreement but had been willing to testify without it. Defense counsel entered the immunity agreement in evidence.

Bivins testified that she watched the surveillance videotape from Terry's Food Mart and that she recognized Bell. He went to the beer cooler and "[i]t showed him walking off the camera and then it showed him walking back up to the counter and getting some money that was just laying on the counter by itself." She could not say with certainty who the other people in the video were.

Bivins testified that she subsequently acquired criminal charges in New Mexico, where she had moved in June 2005 to try to become drug-free, after

13

being beaten up after talking to the police in April 2005. She had been off drugs for a little over a year by the time she testified.

Abbs testified only after she was located, arrested, and brought to court. She identified the individual in State's Exhibit 23 as Bell, the individual in State's Exhibit 24 as Stevenson—someone who lived in her neighborhood—and the individual in State's Exhibit 25 as Hayley. Abbs claimed that she did not recall talking to a female detective on April 18, 2005, and that she did not recall making her statement, although she acknowledged that the signature and handwriting on State's Exhibit 44 did "look like [her] handwriting."

Abbs was a very hostile witness, complaining at one point, "I don't care about this because y'all putting me in some stuff I ain't got nothing to do with. I ain't the one that went with them to rob that damn store." She acknowledged that she had identified and initialed her identification of Stevenson, Bell, and Hayley in photo lineups, but she stated that all she had heard were rumors about the robbery.[5] The trial court included a limiting instruction on impeachment in the jury charge, and it gave a limiting instruction with regard to the following questioning:

---

[5] Abbs testified that she had a bad memory because she had seizures and "was in a coma like three months ago" and almost died. She testified that when she "came out of it," she did not remember her social security number and barely remembered some family members.

14

[State's counsel]: Ms. Abbs, do you recall hearing from: I heard T.T. say something like do you remember when I busted a cap at that—

[Defense counsel]: . . . My objection is this should only go as to impeachment unless the witness clearly remembers.

    . . . .

The Court: Yeah. The statement that's being made now is just for impeachment purposes only. Not for the truth or the probative value of it.

    . . . .

[State's counsel]: Ms. Abbs, do you recall hearing an individual you labeled in the statement as T.T., the same person you pointed out here in the courtroom today, say something like, ["]You remember when I busted at that,["] and you used—you put the N word out in quotes?

[Abbs]: I remember hearing something like that. I don't remember whose mouth it came out of. Because there was a lot of rumors coming and going around the hood at the time. . . . I don't remember, but they asked me to write something down, you know what I'm saying? But I don't remember what—what . . . . Yeah, this might be my hand printing on this paper[,] . . . but I don't remember saying that stuff.
    You got evidence, y'all said I talked to that lady over there on Belknap . . . [w]ell, let her sit in here tell you if y'all got any evidence . . . .

[State's counsel]: Detective . . . Waters and Detective Carroll are the next two witnesses. . . .

[Abbs]: That's cool.

[State's counsel]: Now, that's your handwriting, correct? Yes or no?

15

[Abbs]:  Do I have to answer this, Judge?

The Court:  You told him that's your handwriting, correct?

[Abbs]:  Yeah.  And I told him yeah.  Why he keep asking me that?  He getting on my nerves.  He's fixing to make me mad.  You know what I'm saying?  I sure hate to start cussing and acting a fool.  I don't know.

The Court:  You're not going to start cussing and acting a fool.

Detective Michael Carroll testified that he and Detective Sara Jane Waters interviewed Abbs on April 18, 2005, and that Abbs was extremely reluctant to talk with them.  He stated, "It was obvious that she really—she knew information but really didn't want to give the information to us for fear that she may be injured or hurt."  Detective Waters also testified that Abbs was very reluctant and that they did not force her to make her statement.  Detective Waters read Abbs's redacted statement in evidence, which in pertinent part stated:

> For about the past year I've been friends with a guy I know as Boo.  I don't know his real name.  He stays somewhere on Savage [Drive] with his grandmother.  Boo hangs out a lot on Bandy [Avenue] at Julian's house . . . .  Boo has been dating Amanda[,] a white girl I know.
>
> On Tuesday, April 12th, 2005, at about 9:30 or 10 that night[,] me, Boo, M'Kail, my sister Marian, and my big brother Bruce were all at my house on Glasgow [Road].  When he finally left, it was two in the morning.  He was on foot.  I didn't know where he went.

16

The next time I saw Boo was on Thursday about noon . . . . Boo was across the street and I called him over. I gave him 50 cents and asked him to buy a cigar for me. . . .

By then we were at Julian's house and we went inside. Julian and [Stevenson] were already there and so was my little sister Marian and some mixed-race boy that I don't know his name. Julian was falling asleep on the sofa. [Stevenson] w[as] talking about what they did. I heard [Stevenson] say something like[, "]do you remember when I busted at that n[*****].["] [Stevenson] was talking about having a box of squares—cigarettes, and Marian asked him where he got the money for squares. He said he didn't have no more money because he spent it on a gauge—a shotgun.

She already knew where he had gotten the money because she heard him talking about the store he had robbed. We were only there for about 45 minutes when Amanda pulled up to pick us up. We got into her car, which is a black four door. We dropped him off on Savage [Drive] and he gave me $10 when he got out. He didn't say what it was for. He just got out of the car without saying anything else to Amanda because . . . he knew she was mad at him.

. . . Amanda pulled up about 30 minutes later. She showed me the newspaper article about the robbery and murder on Hemphill. I knew then that it was the store that Boo, [Stevenson], and Julian had robbed.

. . . I didn't see Boo again until today. When I got home at 2:30 this afternoon he was there. Saw that he had a whole bunch of 10s and 20s and stuff. He had maybe a couple of a hundred dollar bills, too, but I didn't get a real good look.

I don't know . . . [Stevenson's] real name or Boo's, but I did pick out pictures of them in the photo spreads I was shown.

In handwriting, Abbs's redacted statement contained the following: "There's

a number . . . and then it says 'my phone' and the number sign. And then it

17

says: T.T., we were talking about the robbed store and got the money. T.T. told me that he had shot at somebody or shot somebody when he said [']I bust at that n[******].['] " Detective Waters testified that she watched Abbs write this on her statement.

Meredith testified that he and Bivins used to do cocaine together. He testified that Terry's Food Mart was only a seven-to-ten minute trip from his neighborhood—he lived on Savage Drive—and that Stevenson, Bell, and Hayley were "some kids from the neighborhood." He testified that Bell wore his hair in braids, that Stevenson was the shortest of the three "kids," and that Bivins had a black, small to mid-sized car.

On April 13, 2005, Bivins and Bell arrived at Meredith's house a little before dark; Bivins remained there for around an hour after Bell left with her car. When Bell returned in Bivins's car, Hayley was with him; another vehicle, a light-colored Lincoln, was behind them, with "Ant" driving and Stevenson in the back seat. Meredith took an empty cash register till that was handed to him and put it in his trash can. He testified that Bell and Hayley were "an adrenaline flow type" hyper; Bell gave Bivins $20, and then Bell, Hayley, and Stevenson left in the Lincoln. Meredith admitted to his criminal history.

Dr. Mark Krause, Tarrant County Deputy Chief Medical Examiner, testified that he performed the autopsy on Karim and ruled that the manner of death

18

was a homicide. The cause of death was laceration of Karim's heart due to a gunshot wound to the chest. He testified that if the bullet "had been about an inch and a half further forward it would have missed him completely."

The State entered in evidence a pro se motion filed by Stevenson while he was in jail awaiting trial, complaining of excessive bail and requesting a reduced amount of bond. The motion states in pertinent part:

> Comes now Tarrence L. Stevenson, No. 0653620, Defendant in the above entitled and numbered cause and moves the Court to—to grant a writ of habeas corpus and . . . in support of such motion shows. Your Honor, I am legally restrained, confined in the county jail . . . .
>
> Your Honor, I am charged with the offense of murder (cap), by Indictment No. 0974892, pending in . . . Court of Tarrant County, Texas. . . . And Applicant was arrested on April 14, 2005. Your Honor, I have been in custody for failure to enter into bail on said charge in the amount of 250,000. . . .
>
> . . . .
>
> Your Honor, I am 17, about to turn 18 on the 13th of September and I am a life-long resident of Fort Worth, Texas. And I have—have currently enrolled in GED classes since I've been incarcerated. I have a very well Christian oriented family willing to . . . go the extra mile to get me in the right direction, sir . . . .
>
> . . . Your Honor, my mother is also a hardworking mother of three children who does her best to assure of my well being. I'm her youngest child and I know I've made my family ashamed of my fatal mistake, Your Honor. Sir . . . since I've been in jail, Your Honor, I have really come to understand my serious mistake in life, Your Honor . . . .

Your Honor, I'm not a bad human being. I made a bad decision back in April and I am sorry for [the] wrong I'm accused of, sir.

. . . Respectfully submitted this 24th day of August, 2005. Signed Tarrence Stevenson.

D. Sufficiency Analysis

Stevenson complains that there is no direct evidence that he was involved in the robbery and Karim's shooting, stating that there were "[n]o fingerprints, no clear images of the participants, no gun recovered, no money or till recovered, no correct identification of the involved vehicle, no clothing, no co-defendant testimony[,] and so forth." He argues that the only evidence connecting him to the robbery is a motion for habeas corpus relief that he did not adopt, Abbs's redacted statement, and the testimony of Bivins, a confessed drug user.

1. Legal Sufficiency

Notwithstanding the absence of fingerprints, the gun, the till, the clothing, and co-defendant testimony, viewing the above evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of felony murder beyond a reasonable doubt such that the evidence is legally sufficient. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. To convict Stevenson

20

of felony murder, the jury had to conclude beyond a reasonable doubt that, either acting alone or as a party or conspirator, and in the course of committing or attempting to commit a robbery, Stevenson shot a firearm at or in the direction of Karim, "an act clearly dangerous to human life" that caused Karim's death. *See* Tex. Penal Code Ann. § 19.02(b)(3).

Brenda and Patrick Kilpatrick testified that, during the course of a robbery of Terry's Food Mart, Karim was shot by the shortest individual involved in the robbery. Several people testified at trial that Stevenson was the shortest of Stevenson, Bell, and Hayley. Bivins testified that Stevenson told her the gun was loaded before he left with Bell and Hayley, and that when she asked Stevenson where they had gone, he told her, "Terry's Food Mart on Hemphill," and told her that he shot at somebody "to scare them, but [he] didn't shoot anybody." The medical examiner testified that the bullet would have missed Karim if it "had been about an inch and a half further forward," and that the gunshot wound to the chest killed him. We overrule this portion of Stevenson's first issue.

2. Factual Sufficiency

Viewing all the evidence in a neutral light, we also conclude that the evidence is factually sufficient. With regard to the lack of fingerprints, Detective Henz, who testified that he had a master's peace officer certificate

21

and that he taught crime scene courses to academy recruits, gave extensive testimony about what a fingerprint of "value" would consist of, testified that he tested for fingerprints "any spot that we would have been made aware of that somebody came in and touched," and explained to the jury that he did not find any fingerprints of any value. The fact that the police were unable to recover the till was explained by Meredith, who testified that he placed it in his garbage can. The absence of the money—the purpose of the robbery—and the absence of the gun—the instrument of death according to the medical examiner's testimony—make no difference in the analysis when circumstantial evidence, by itself, can be enough to support the jury's verdict. *See Kutzner*, 994 S.W.2d at 184. Patrick and Brenda both testified that the gunman demanded money, received it, and shot Karim.

In addition to the testimony above, the jury was made aware of Patrick and Brenda's criminal histories, but they also considered testimony and audio-visual evidence presented by Fredericks, the forensic video analysis expert, that corroborated Patrick's and Brenda's testimonies about the events that night at Terry's Food Mart.

The jury was also made aware of Bivins's immunity agreement and history of drug abuse, but the testimony she gave about renting her black four-door car in exchange for drugs was corroborated with testimony by Rojas who

22

saw a black four-door car parked at the Shell station next door to Terry's Food Mart on the night in question and also saw a man with a black hood run toward the passenger side of the vehicle and get inside. Bivins's testimony also matched up with Pyles's testimony about seeing a parked, dark-colored, four-door car at the Shell station that night and about nearly hitting two men in dark hoodies who were running to the vehicle. The jury could have reasonably disregarded Pyles's and Rojas's identifications of the vehicle as other than an Oldsmobile Cutlass, given that they saw the vehicle at night under stressful circumstances—Rojas heard the gun that killed Karim go off, and Pyles nearly hit the robbers with her car. The jury also heard Bivins testify that she would have been willing to testify without an immunity agreement, and we must give due deference to the jury's determinations concerning the weight and credibility of such testimony. *See Johnson*, 23 S.W.3d at 9.

Even without Abbs's written statement, in which she stated that she heard Stevenson talk about "bust[ing] at" somebody and talking about the store he had robbed, which was read in evidence by the officer who took the statement, and the statements in Stevenson's pro se motion about his "fatal mistake," his "bad decision back in April," and how he was sorry for the wrong he was accused of, we conclude that the evidence was not so weak that the jury's determination is clearly wrong and manifestly unjust, or that conflicting

23

evidence so greatly outweighs the evidence supporting the conviction that its determination is manifestly unjust. *See Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414–15, 417. We overrule the remainder of Stevenson's first issue.

## IV. Evidentiary Objections

In his remaining three issues, Stevenson complains that the trial court erred when it admitted the following evidence: "a document . . . which contained statements against interest but [was] in fact a legal pleading"; "out of court statements of a reluctant witness"; and "the testimony of an expert witness over a Daubert objection."

### A. Standard of Review

An appellate court may not disturb a trial court's evidentiary ruling absent an abuse of discretion. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). In other words, as long as the trial court's decision was within the zone of reasonable disagreement and was correct under any theory of law applicable to the case, it must be upheld. *Id.* (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)). This is so because trial courts are usually in the best position to make the call on whether certain evidence should be admitted or excluded. *Id.*

B. Motion for Bail Reduction

Stevenson complains that the trial court erred by admitting a pro se motion for writ of habeas corpus for bail reduction that he filed prior to trial, which he signed but which was allegedly authored by another inmate. The pertinent contents of the motion are set out in our recitation above, and the trial court stated that it was admitting the motion "based upon 803.24, statement against interest."

Stevenson complains that the motion should not have been admitted under rule 803(24) because it was not corroborated and because the trial court failed to address the motion's trustworthiness. Stevenson is correct that the statements should not have been admitted under rule 803(24)—the underlying premise of that rule is that the statements were made by a *third* person, not by the accused. *See Spivey v. State*, 748 S.W.2d 18, 19–20 (Tex. App.—Houston [1st Dist.] 1988, no pet.).

Nonetheless, the trial court did not abuse its discretion by admitting the motion because the statements in the motion were admissible under rule 801(e)(2) as statements by a party-opponent. *See* Tex. R. Evid. 801(e)(2)(A)–(B) (reciting that a statement is not hearsay if the statement is offered against a party and is the party's own statement in either an individual or representative capacity or a statement of which the party has manifested an

25

adoption or belief in its truth); *McNair v. State*, 75 S.W.3d 69, 72 (Tex. App.—San Antonio 2002, no pet.) ("Rule 801(e)(2)(A) plainly and unequivocally states that a criminal defendant's own statements, when being offered against him, are not hearsay."); *see also Moore v. State*, 999 S.W.2d 385, 401 (Tex. Crim. App. 1999) ("By signing Detective Holguin's transcription of the oral statement, appellant manifested an adoption or belief in its truth."), *cert. denied*, 530 U.S. 1216 (2000); *Trevino v. State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999) (disavowing any precedent indicating that the statement of a party, when being offered against him, is hearsay). Because Stevenson signed the motion, thereby adopting the statements contained therein as his own, the statements were admissible against him as admissions by a party-opponent. Therefore, on this basis, the trial court did not abuse its discretion by admitting the motion in evidence. *See Winegarner*, 235 S.W.3d at 790 (stating that we must uphold the trial court's decision if it was correct under any theory of law applicable to the case).

We must next consider Stevenson's argument that the motion was inadmissible under *Simmons v. United States*. 390 U.S. 377, 88 S. Ct. 967 (1968). *Simmons* involved testimony given by a defendant in support of his motion to suppress—he testified that he owned a suitcase containing incriminating materials in order to show that he had standing to bring his

26

motion. *Id.* at 390–91, 88 S. Ct. at 974–75. That testimony was later admitted at his trial and was instrumental in convicting him. *Id.* at 389, 88 S. Ct. at 974. The Supreme Court reversed the conviction, holding, "[W]hen a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." *Id.* at 394, 88 S. Ct. at 976.

One of our sister courts has extended *Simmons* to hold that "a defendant may testify in a bail hearing regarding his ability to make bail without subjecting himself to cross-examination on the nature and circumstances of the offense with which he is charged." *Ex Parte Homan*, 963 S.W.2d 543, 544 (Tex. App.—Tyler 1996), *pet. dism'd, improvidently granted*, 962 S.W.2d 599 (Tex. Crim. App. 1998); *see also Avila v. State*, 856 S.W.2d 260, 261 (Tex. App.—El Paso 1993, pet. ref'd) (citing *Simmons* for the proposition that a person may not be required to surrender one constitutional right to assert another with regard to testifying about the voluntariness of her statement outside the jury's presence). *But see United States v. Ingraham*, 832 F.2d 229, 237 (1st Cir. 1987) (describing bail hearings as "a fundamentally different breed of cat" from suppression hearings in that the accused's bail rights are not so contingent on his ability to speak without fear of the future use of his

testimony that he must be granted a blanket immunity from use of all statements made during an initial hearing, particularly as the information may in large part be concerned with the accused's employment record, family status, ties to the community, and information about the charged crime can usually be obtained from sources other than the accused's own testimony), *cert. denied*, 486 U.S. 1009 (1988); *United States v. Dohm*, 618 F.2d 1169, 1173 (5th Cir. 1980) (en banc) ("Testimony required at a fourth amendment suppression hearing differs in nature from that required at a bail bond hearing.").

Here, Stevenson voluntarily submitted a motion for reduction of bond, upon which no hearing was held. Because there was no hearing on the motion, Stevenson was not subjected to cross-examination on the offense's nature and circumstances. *Cf. Homan*, 963 S.W.2d at 544. And based on the rules for fixing the bail amount, Stevenson was not required to include any of the controversial statements in order to request a reduced bail amount.[6] *See* Tex. Code Crim. Proc. Ann. art. 17.15 (Vernon 2008) (setting out the rules for fixing the bail amount, including the nature of the offense and its circumstances, the

---

[6] Stevenson's trial counsel acknowledged that the motion was "fairly close to . . . one that a lawyer would draft." The trial court agreed, stating, "No doubt about it. I mean, he just put more in it than he should have put i[n] i[t]."

28

ability to make bail, and the future safety of the community). Here, although Stevenson may have believed these statements would help him get a reduced bond, he was not actually faced with being forced to choose between basic constitutional rights (that is, between suppression and self-incrimination, or between reduced bail and self-incrimination). Under these facts and circumstances, *Simmons* and its underlying reasoning are inapplicable. We overrule Stevenson's second issue.

### C. Reluctant Witness

In his third issue, Stevenson argues that the trial court erred by admitting Abbs's statement because Abbs did not adopt the language of her statement, its admission was contrary to the trial court's impeachment instruction, and it contained hearsay that the defense was not able to cross-examine.

Preservation of error is a systemic requirement that this court should review on its own motion. *Archie v. State,* 221 S.W.3d 695, 698 (Tex. Crim. App. 2007); *Jones v. State,* 942 S.W.2d 1, 2 n.1 (Tex. Crim. App. 1997). Among other methods to preserve a complaint for our review, a party must have presented to the trial court a timely objection, which the trial court then ruled on. *See* Tex. R. App. P. 33.1(a)(1)–(2); *Mendez v. State*, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004); *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied,* 526 U.S. 1070 (1999).

29

And to preserve error, a party must continue to object each time the objectionable evidence is offered. *Fuentes v. State*, 991 S.W.2d 267, 273 (Tex. Crim. App.), *cert. denied,* 528 U.S. 1026 (1999); *Ethington v. State*, 819 S.W.2d 854, 858–59 (Tex. Crim. App. 1991). A trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling. *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *Johnson v. State*, 803 S.W.2d 272, 291 (Tex. Crim. App. 1990), *cert. denied*, 501 U.S. 1259 (1991), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991).

The trial court admitted State's exhibits 44 and 63 (a copy of Abbs's statement and the original) over Stevenson's objections that they constituted hearsay and violated the Confrontation Clause under *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 1368–69 (2004). After the trial court overruled the objections, Stevenson requested a limiting instruction on impeachment. The trial court stated, "Yes. And I'll also include it in my

charge."[7]  However, after Abbs's testimony, the parties had the following

conversation about the statement outside the jury's presence:

> The Court:  All right.  I have the statement, that is Exhibit 63, [defense counsel] has highlighted some statements attributed to someone other than his client and ask[s] that we take those statements out or black them out.
>
> . . . .
>
> [State's counsel]: I have no problem with everything you've highlighted that's typed.
>
> [Defense counsel]:  All right.
>
> [State's counsel]:  The State's problem is [the handwritten portion is] talking about your client . . . and we'd object because now it's—on [the] grounds that it's too late to begin with.  But we're being nice and—and not protesting for that.  But we would—that's part of your client, she's talking specifically about Boo and T.T. in combination . . .
>
> [Defense counsel]: . . . .   My purpose was to identify those sections in which they are statements attributed to Boo or Julian, which would—even if this witness had adopted them, would be hearsay. . . . Just to be more specific, the handwritten portion over which we now, I think, dispute says Boo-N-T-T, which I'm going to interpret to mean Boo and T.T., were talking about how they robbed the store and got the money, period.
>
> . . . .

---

[7] The trial court included an instruction on impeachment in the jury charge.  Neither party objected to its inclusion.  Stevenson argued that instruction applied to Abbs's statement during his closing argument.

31

The Court: All right. Well, I've already admitted 63 and 44. Now, if [the] State doesn't have any problem with redacting the blue [typewritten] that you've highlighted, then that's fine. . . . The handwritten part talks about both Boo and T.T. so I don't know how I can take that out because I can't distinguish which one we're talking about. She's saying both of them.

The parties agreed to redact "Boo N" from the handwritten portion of the statement.

[State's counsel]: *We're going to ask that it be—63-B at this point be admitted for all purposes* with the caveat that we're going to clean it up or the jury never gets to hold on to it . . . until we've whited everything out.

The Court: All right . . . . Publish it by reading?

[State's counsel]: Yes. . . . Anything that's in purple doesn't get read.

[Defense counsel]: [Detective Waters] will read, excepting the purple stuff.

[State's counsel]: And that's what I'm going to go tell her while you have [Detective] Carroll on the stand.

The Court: All right. Who's next?

[Defense counsel]: *That's fair*.

The Court: That's fair. All right. Let's get them in.

[Emphasis added.] Subsequently, without objection, Detective Waters published the redacted version of Abbs's statement, State's Exhibit 63-B, by reading it to the jury.

32

It is apparent from the record that the jury only received State's Exhibit 63-B.[8] Because Stevenson failed to object to the admission and publication of the redacted statement for all purposes, we conclude that the errors now complained of were not preserved. *See* Tex. R. App. P. 33.1(a); *Leday*, 983 S.W.2d at 718; *Johnson*, 803 S.W.2d at 291; *see also Curry v. State,* 910 S.W.2d 490, 496 & n.2 (Tex. Crim. App. 1995) (stating that constitutional errors can be forfeited). We overrule Stevenson's third issue.

## D. Daubert Objection

In his final issue, Stevenson complains that the trial court erred by allowing Fredericks, the State's forensic video analysis expert, to testify as an expert under rule 702 of the Texas Rules of Evidence.

Rule 702 states,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

---

[8] After beginning deliberations, the jury requested both Abbs's and Bivens's written statements, and the parties held the following conversation:

The Court: The note says, ["]We would like to review the written statement of Ms. Abbs and Ms. Bivens the night they were brought down to the station . . . .

[Defense counsel]: That's State's Exhibit 63-B, which is the whited out version of Shawntee Abbs. That's fine, Judge.

33

experience, training, or education may testify thereto in the form of an opinion or otherwise.

Tex. R. Evid. 702. Thus, before admitting expert testimony under rule 702, the trial court must be satisfied that three conditions are met: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the factfinder in deciding the case. *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006).

Furthermore, a trial court need not exclude expert testimony simply because the subject matter is within the comprehension of the average jury. *See id.* & n.7. That is, if the witness has some special knowledge or additional insight into the field that would be helpful, then the expert can assist the trier of fact to understand the evidence or to determine a fact in issue. *Id.* at 527. An expert may add precision and depth to the ability of the trier of fact to reach conclusions about subjects that lie well within common experience. *Id.* Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case. *Id.* at 527–28.

The court of criminal appeals has set out the following criteria to consider in assessing whether a trial court has abused its discretion in ruling on an expert's qualifications:

> First, is the field of expertise complex? The degree of education, training, or experience that a witness should have before he can qualify as an expert is directly related to the complexity of the field about which he proposes to testify. If the expert evidence is close to the jury's common understanding, the witness's qualifications are less important than when the evidence is well outside the jury's own experience. . . . Second, how conclusive is the expert's opinion? The more conclusive the expert's opinion, the more important is his degree of expertise. . . . And third, how central is the area of expertise to the resolution of the lawsuit? The more dispositive it is of the disputed issues, the more important the expert's qualifications are.

*Id.* at 528 (internal citations omitted).

During the *Daubert* hearing, Fredericks testified that he had a degree in broadcast telecommunications, that he was an instructor at the FBI National Academy for forensic video analysis, and that for over twenty years, he had been a forensic video analyst doing forensic video analysis work worldwide. He defined "forensic video analysis" as "the scientific examination, comparison[,] and evaluation of video in legal matters." He also described two of the FBI's scientific working groups in the field of forensic video analysis, the Scientific Working Group on Imaging Technology and the Scientific Working Group on Digital Evidence, and explained that the purpose of such working

35

groups was to establish standards for the processing of analog and digital video evidence.  He testified that he had published articles regarding forensic video analysis that were subject to peer review, that he had testified as an expert in forensic video analysis in the United States and Canada, and that he had co-authored "Best Practices for the Acquisition of Digital Multimedia Evidence," the standard for the acquisition of digital video evidence.  He testified that "any analyst with the appropriate training could take [his] written report [in this case] and all of the data and reproduce [his] work exactly from them."

Fredericks aligned the material on the surveillance videotapes with the three different 911 audio sources and explained that in forensic video analysis parlance, an "artifact" was "anything that is produced by the video signal that . . . was not . . . part of the camera's view[;] . . . elements of the image, because of the tape medium, where there'll be flashes of light . . . [or] dark areas that need to be processed" to determine whether they were errors in the video signal or actually an object there in the scene.

Defense counsel asked, with regard to Fredericks's expertise in observing video, "[I]s there any tool, forensic tool, that you used to form that opinion [that three males were involved in the robbery, one had a handgun, and one removed bills from the cash drawer] other than fixing the image, making it still or playing it over and over again?"  Fredericks responded,

36

Yes. . . . I'm able to track the motion of [the gunman's] hand. For instance, in—in this particular case my experience . . . is that when I explain to somebody here is the person entering. The person I'm showing goes, ["]Wait, I don't see the person entering.["] So we'll very carefully say this area of darkness is a body entering the image. And then I can track it and explain what image—for the record, with the number, what image it starts on, where the person goes to. And then I say, ["S]ee here is the gun coming out,["] the person I'm describing to goes, ["]I don't see a gun.["] So then I circle it, I point it out, and then I track it. And they go[,"N]ow I see the gun.["] . . . .

My experience is after examining tens of thousands of videotapes, providing this kind of evidence as a forensic video expert throughout North America in over 60 cases like this, the layperson does not see what I see until I explain it. You—to show it still image and to say—to step back and let a layperson assess what is on the image, they won't see five percent of what I see . . . . [M]y experience is that a—a layperson cannot appreciate what they are looking at unless it's fully and clearly explained to them.

Fredericks acknowledged that the tape quality was a poor, black-and-white video and explained that he determined what was money by going back on the videotape several hours and watching multiple transactions—"[s]o with multiple transactions in typical convenience store setting, . . . it was my opinion that . . . that was money." He testified that he sends a number of his cases for peer review but that he did not recall whether he sent this particular case. He acknowledged that one particular event—the conclusion that someone was taking money from a cash drawer—would be a common sense observation and that he was not aware of any publication that described the process of looking

at video, stopping the images, and forming such opinions.  However, he also pointed out that the value of the opinion was in figuring out "what's in the box," i.e., how one would determine that the box contained money—"[t]hat would be something that I could assist the trier of fact to answer if—if that question is—arises."  He testified that photographic and video comparison is the examination and comparison of a known object to a questioned object—in this case, "is that box that was seen on video, that was removed from the counter, the same box that was photographed on April of 2005?  And in its position, its size, location, shape, and other features, in fact, I formed the opinion that that is the same box."

In the first portion of his complaint, Stevenson argues that Fredericks should not have been allowed to testify as an expert under rule 702 because "there was no underlying theory to support, nor novel scientific methodologies to support the findings"—that is, he complains that what Fredericks testified to "was mechanical manipulation of videos and tapes."  However, this argument does not comport with the ones made at the *Daubert* hearing, in which Stevenson stated, "Just so I'm—I'm clear on what I'm complaining about and I'm not complaining about.  *I'm not complaining about the—the display of the videos, the three different views that are the result of his work and his processing, filtering, analyzing, and so forth*. . . .  *I have no quarrel he's an*

*expert in many areas of video analysis.*"    [Emphasis added.] *See, e.g.,*
*Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004) (stating that it is well settled that the legal basis of a complaint raised on appeal cannot vary from that raised at trial).  Therefore, we overrule this portion of Stevenson's fourth issue.

Despite the several objections Stevenson made to Fredericks's testimony during the *Daubert* hearing and at trial, his only specific complaint on appeal, set out "[a]s an example for the proposition that Fredericks is not an expert," is that State's Exhibit 64, Fredericks's report of his investigation, forces a conclusion that it is not an expert opinion:

> Page 000515 of the report shows a "Measurement Standard" which Fredericks placed in the store in an appropriate location after the fact and then superimposed the actual video over it to show the relative height of one of the robbers against the "Measurement Standard" as shown in the stills on page 000516.  Fredericks['s] conclusion was that Male No. 1 is taller than 5'8''.  This conclusion is not an expert opinion, nor the results of a test of the underlying theory, nor the results of the novel scientific methodology used. It was merely an observation which could have been made by a lay person with some fancy equipment.

However, Fredericks testified during the *Daubert* hearing that "part of the subdiscipline of forensic video analysis includes height comparison of individuals . . . [by] going back to the scene, calibrating the camera, and taking a height standard, and placing it back where one of the individuals was standing," so

that he could provide some information about height. He testified that he did not make estimates of the individuals' heights, i.e., how tall they were, but instead made observations about their comparative heights.

Having reviewed the videotape evidence, with regard to this complaint, we conclude that the trial court did not abuse its discretion by allowing Fredericks to testify as an expert because it could have concluded, based on Fredericks's testimony at the *Daubert* hearing, that Fredericks was an expert in forensic video analysis, that the subject matter was appropriate for his testimony, and that admitting Fredericks's testimony would actually assist the jury in deciding the case. *See Rodgers*, 205 S.W.3d at 527. That is, the trial court could have reasonably concluded that even though the jurors could see for themselves the sequence of events at Terry's Food Mart on the videotape, Fredericks's testimony could help clarify what they were seeing on the poor-quality black-and-white video, particularly with regard the comparison of the individuals' heights. *See, e.g., Lerma v. State*, No. 14-98-00977-CV, 2000 WL 123768, at *5 (Tex. App.—Houston [14th Dist.] Feb. 3, 2000, pet. ref'd) (not designated for publication) (holding that it was not ineffective assistance of counsel to fail to object to qualifications of expert witness who testified concerning measurements made at the murder scene and his extrapolations of the height of one of the assailants from those measurements); *cf. Gonzales v.*

40

*State*, No. 02-04-00466-CR, 2006 WL 820387, at *2–4 (Tex. App.—Fort Worth Mar. 30, 2006, pet. ref'd) (mem. op., not designated for publication) (finding harmless error when the trial court allowed expert to narrate videotape for the jury because "there is no evidence that Fredericks had any special training in a field that qualified him to offer an expert opinion as to what appellant's intent was in gesturing to the gunman . . . [and] the jury did not need [his] assistance to determine appellant's intent"). We overrule Stevenson's final issue.

V. Conclusion

Having overruled all of Stevenson's issues, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL: LIVINGSTON, MCCOY, and MEIER, JJ.

PUBLISH

DELIVERED: January 14, 2010

41