

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NOS. 02-10-00060-CR**
**02-10-00061-CR**
**02-10-00062-CR**
**02-10-00063-CR**
**02-10-00064-CR**
**02-10-00065-CR**
**02-10-00066-CR**
**02-10-00067-CR**

DINO MEJIA                                                                                    APPELLANT

V.

THE STATE OF TEXAS                                                                              STATE

----------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In six points, pro se appellant Dino Mejia appeals his convictions for eight burglaries.[2]  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Penal Code Ann. § 30.02(a)(1), (3) (West 2011).

**Background Facts**

In 2008, through separate indictments, the State charged appellant with burglarizing eight habitations. The indictments contained enhancement paragraphs alleging that appellant had been previously convicted of two felonies. The trial court appointed counsel to represent appellant, and the parties filed several pretrial documents.

A jury found appellant guilty of all eight burglaries. The trial court found the indictments' enhancement paragraphs to be true and sentenced appellant to seventy-five years' confinement on each offense. The court ordered the sentences to run concurrently with each other, but it decreed that all of the sentences could not begin to run until the expiration of a sentence for appellant's burglary conviction from Dallas County.[3] Appellant filed a motion for new trial and brought these appeals.

**Evidentiary Sufficiency**

In his first two points, appellant challenges the sufficiency of the evidence to support his convictions. In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Isassi v. State*, 330

---

[3]*See Mejia v. State*, No. 05-09-00178-CR, 2010 WL 3212063, at *1 (Tex. App.—Dallas Aug. 16, 2010, pet. ref'd) (not designated for publication).

2

S.W.3d 633, 638 (Tex. Crim. App. 2010).[4]  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638.

The trier of fact is the sole judge of the weight and credibility of the evidence.  *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009); *see also Bottenfield v. State*, 77 S.W.3d 349, 355 (Tex. App.—Fort Worth 2002, pet. ref'd) ("The jury is free to believe or disbelieve the testimony of any witness, to reconcile conflicts in the testimony, and to accept or reject any or all of the evidence of either side."), *cert. denied*, 539 U.S. 916 (2003).  Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder.  *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the

---

[4]Appellant purports to challenge the legal and factual sufficiency of the evidence.  But the court of criminal appeals has held that there is no meaningful distinction between the legal sufficiency standard and the factual sufficiency standard.  *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996)).  Thus, the *Jackson* standard is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Id.* at 912.

3

light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Isassi*, 330 S.W.3d at 638. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Isassi*, 330 S.W.3d at 638; *Hooper*, 214 S.W.3d at 13.

A person commits burglary if, without the effective consent of the owner, the person enters a habitation and intends to commit theft, attempts to commit theft, or commits theft. Tex. Penal Code Ann. § 30.02(a)(1), (3); *see also Gilbertson v. State*, 563 S.W.2d 606, 608 (Tex. Crim. App. [Panel Op.] 1978) (explaining that a burglarious entry into a habitation may be established by circumstantial evidence). A person commits theft by unlawfully appropriating property with intent to deprive the owner of it. Tex. Penal Code Ann. § 31.03(a) (West Supp. 2011); *Liggens v. State*, 50 S.W.3d 657, 659 (Tex. App.—Fort Worth 2001, pet. ref'd). To "appropriate" personal property is "to acquire or otherwise exercise control over" it. Tex. Penal Code Ann. § 31.01(4)(B) (West Supp. 2011). Unexplained or unreasonably explained possession of recently stolen property by the defendant may raise an inference of guilt. *See Rollerson v. State*, 227 S.W.3d 718, 725 (Tex. Crim. App. 2007); *Poncio v. State*, 185 S.W.3d 904, 905 (Tex. Crim. App. 2006).

4

**The State's evidence**

**The Mathis burglary**

On April 10, 2008, Heather Mathis left her Lewisville home to work at a private preschool. At the end of the day, she picked up her son, went home, and noticed that "[e]verything had been completely destroyed." A window was busted, picture frames were broken, a back door was open, and Mathis's bedroom had been ransacked. Without permission, someone had entered Mathis's house and had taken a television, VCR, DVD player, video camera, cash, checks, jewelry, and other items.

**The Goetz burglary**

Ruth Goetz arrived at her Lewisville home at around 5 p.m. on April 30, 2008. When Goetz drove through a gate to enter her house's backyard area, she noticed that the back door was open, and when she walked in, she "realized that [she had] been burglarized." Goetz noticed that her television was gone, her entertainment center was almost empty, some jewelry and tools had been taken, and there were "things just thrown on the floor." Because someone had taken her property without her permission, Goetz called the police.

**The Marshall burglary**

The same day that Goetz's house was burglarized, Jennifer Marshall arrived home in Lewisville at approximately 9 p.m. Upon entering the house, Marshall noticed that lights were on and that a laundry room door was open. Marshall called the police. After the police arrived, Marshall saw that a window

5

was broken, and she noticed that jewelry, a mandolin, and small electronics had been stolen. Marshall later recovered some of the stolen property from the police, but she did not recover the mandolin. She testified that she had not given anyone permission to be in her home or to take her property.

**The Walker burglary**

On May 6, 2008, Matthew Walker went to his Lewisville home after eating lunch with his wife, and when he arrived, he saw muddy footprints on the carpet that had not previously been there. When he went upstairs, he noticed that items had been scattered on the floor and that some of his property, including a television and two laptop computers, had been taken without his permission.

On the day of the robbery, one of Walker's neighbors, James Sterett, a convicted felon, came home from running errands and saw a gray station wagon parked in his own driveway with duct tape covering the license plate. Sterett then saw a man coming from Walker's house. The man was Hispanic, middle-aged, had a mustache, and was wearing jeans, a shirt, a light jacket, and a cap. Sterett approached the man and said, "Excuse me. Can I help you?" The man responded that he was looking for a friend whom he thought lived at Walker's house. The man then drove down an alley, but after Sterett went inside his house, the man returned. Sterett went back outside, and the man drove away from the neighborhood. When Sterett learned that Walker's house had been burglarized, he told the police about what he had seen.

6

Some of Walker's other neighbors, the Buffingtons, had security cameras mounted on their house. Walker viewed the recording from the day of the robbery, and he brought pictures from the recording to trial.

Max Gehrke, a Lewisville police officer, was assigned to investigate Walker's burglary (along with Mathis's burglary). He testified that the police could not find usable fingerprints at Walker's house.[5] He viewed the Buffingtons' security recording, which showed a gray Dodge Magnum, a station-wagon-like car, that entered the alley of Walker's residence in the time fame of the burglary. Officer Gehrke put pictures taken from the recording on ListServ, and the response that Officer Gehrke received caused him to develop appellant as a suspect for the burglary.[6]

Weeks after the burglary, Officer Gehrke showed Sterett a black and white photographic lineup with six similarly looking men, and Sterett chose appellant as the man he had seen on May 6. Sterett, who testified that he is "very good at remembering faces," also identified appellant in court as the man with whom he

---

[5]The absence of fingerprint evidence is not dispositive of whether the evidence is sufficient to support appellant's convictions. *See Rascon v. State*, 496 S.W.2d 99, 101 (Tex. Crim. App. 1973) (discussing the absence of fingerprint evidence in circumstantial cases); *LaGrone v. State*, 757 S.W.2d 893, 898 (Tex. App.—Beaumont 1988, no pet.) (upholding a burglary conviction despite the absence of fingerprint evidence).

[6]ListServ is a computer network that police departments use to share information with each other.

had conversed near Walker's house.[7]  He testified, "I was trying to look very hard at [appellant's] face . . . because I knew he had to be doing something no-good with the duct tape on the license plate, . . . and I wanted to remember what he looked like."  On cross-examination by appellant's counsel, Sterett conceded that he had not noticed tattoos on appellant on the date of the offense.  Appellant testified later that he has two tattoos on his face.

**The Hernandez burglary**

After leaving work, Jaime Hernandez went to his Flower Mound home with his wife and children on May 13, 2008.  When Hernandez entered his house, he noticed that lights were on, there was a "mess on the floor," and a computer desk had been moved.  Hernandez called the police, and after they arrived, Hernandez saw a shattered window and discovered that his computer and some framed oil paintings were missing.  Hernandez had not given anyone permission to enter his house or to take his property.

**The Whipple burglary**

On the afternoon of May 14, 2008, the day after the burglary of Hernandez's house, Melody Whipple arrived at her house and noticed that her front door was unlocked, which was unusual.  After opening the door, seeing that

---

[7]To the extent that appellant argues that the trial court should have excluded evidence of Sterett's pretrial identification of appellant on the basis that the identification was unreliable or coerced, we hold that appellant forfeited the argument by failing to seek exclusion of the evidence on that ground at trial. *See* Tex. R. App. P. 33.1(a)(1); *Perry v. State*, 703 S.W.2d 668, 671 (Tex. Crim. App. 1986).

the back door was "wide open," and noticing that a keyboard had been placed upside down on the top of a couch, Whipple called 911. When the police arrived, Whipple learned that a burglar had taken cash, a plasma television, a shotgun, two camcorders, a purse, silverware, and jewelry. The burglar had left a muddy footprint in the kitchen of Whipple's home.

**The Stevenson burglary**

Chesley Stevenson and his wife, Karen, met his sister-in-law for dinner on May 31, 2008. After dinner, Stevenson's wife spent time with her sister while Stevenson went back to his Lewisville home. When he arrived there, he saw a "light blue" or "silverish" Dodge Magnum parked in the grass behind his neighbor's house. Stevenson entered his back yard and saw that the door to his house was open. After Stevenson ran into the house, he noticed that the master bedroom was in "disarray." When Stevenson went back outside, the Dodge Magnum was gone. Stevenson realized that without his permission, someone had taken an entire jewelry chest, some CDs, power tools, and cash from the house; he estimated the value of the items taken at $18,000. Karen testified that the pictures of the car from the Buffingtons' surveillance recording matched Chesley's description of the uniquely colored car that he had seen.

**The Lawlor burglary**

Lynn Lawlor arrived at her two-story Lewisville home after work on June 4, 2008, and she found that a window was open and that there were a "whole bunch of papers on the floor." Lawlor deduced that someone had been in her

9

house without her permission, and she called the police. After the police and Lawlor's husband arrived, Lawlor noticed that parts of the house had been ransacked and that several items were missing, including jewelry. Lawlor and her husband testified that they did not give anyone permission to enter their home or to take their property.

**The Dallas burglary**

On June 10, 2008, Rebecca Cecil returned from work to her duplex in Dallas. In her neighbor's driveway, Cecil saw a car that was "greenish-gray" and "looked like one of those Dodge station wagons." The car was running with no one in it. While Cecil was still inside her garage, she "heard some thumping upstairs." As Cecil approached the duplex, she saw a Hispanic, middle-aged man moving around near the back of her fence. Cecil asked him what he was doing. He replied, "I'm looking for somebody," and then he got into the running car and left. Cecil went into the duplex, and in her bathroom, all of the jewelry chest drawers were empty and were on the floor. Cecil called the police, and she eventually retrieved earrings, pins, watches, and other jewelry that had been taken from her residence. Cecil testified that appellant was the man who had run near her fence and had left in the Dodge station wagon.[8]

Portia Cooke, Cecil's neighbor in the duplex, saw a gray Dodge Magnum outside of the duplex on the day that Cecil's house was burglarized. Consistent

---

[8]The Dallas Court of Appeals affirmed appellant's conviction for burglarizing Cecil's house. *See Mejia*, 2010 WL 3212063, at *5.

10

with Sterett's testimony in connection with the burglary of Walker's house, Cooke testified that the Magnum had "tape over the plate in the back." Cooke testified that the car she had seen matched the make and model of the one displayed by the photographs taken from the Buffingtons' surveillance recording.

**The police's investigation of the burglaries**

Detectives gathered information by which they believed that the eight Denton County burglaries were linked together. Specifically, the method of the burglaries, the types of items that were taken, and the neighborhoods they were committed in were similar.

On June 10, 2008, the same day as Cecil's burglary and appellant's arrest, Dallas Police Department (DPD) Officers Corey Parker and Michael Clifford, along with Detective Fred Mends, were at Budget Suites on Stemmons Freeway for several hours to watch room 3073, which they believed to be associated with appellant. The officers eventually saw Mickie Young leave the room, and they believed, based on a conversation with Young, that they had consent to search it. The officers never saw appellant enter or leave room 3073. Upon searching room 3073, which appeared to be occupied by a man and a woman based on the types of clothes there, the police found jewelry, fur coats, cologne, perfume, and paintings; the officers had to call for a truck because there was "[t]oo much property to put in [their] cars."

After seizing these items, the officers took them to a police station so that "different complainants all over the Metroplex" could identify and retrieve their

11

property. The next morning, the DPD assigned Detective Philip Strodtman to take over the investigation of the burglaries associated with the property found in room 3073. Detective Strodtman communicated with officers in other police agencies and released various items of property to their owners. Stevenson, Goetz, Mathis, Marshall, Hernandez, Whipple, and Lawlor all identified property they owned that had been seized from room 3073.

Diane Willis was managing the Budget Suites on Stemmons Freeway in June 2008. Willis testified that room 3073 was leased to Young and appellant, although Young paid the rent. Willis had not noticed appellant entering room 3073, but she had seen appellant "[m]any times" in the company of Young. She confirmed that appellant was "registered to the room," and she knew that appellant drove a "gray-silver" Dodge Magnum for eight months to a year preceding his arrest. According to Willis, appellant had been at Budget Suites on the night of his arrest, and about a week before that, she had seen him unload groceries into room 3073.

Lewisville Police Department Detective David Henley investigated the burglary of the Stevensons' house, Goetz's house, and Marshall's house. After receiving information from Detective Philip Strodtman on ListServ concerning appellant, in June 2008, Detective Henley entered appellant's name into LeadsOnline, which led Detective Henley to visit Cash Pawn No. 25, to take pictures of some of the items held there, and to eventually seize those items. Joel Mendez, who manages that pawnshop, testified that the pawnshop requires

12

identification from people who sell merchandise to the store. The pawnshop also classifies all of the items that are pawned or sold to the shop by the people who sell them. Mendez testified that appellant had sold items to the pawnshop in 2008 on June 1 and June 5. An exhibit shows that appellant received more than $1,000 for pawning thirty-eight items on those days. Among those items were diamond rings, birthstone rings, a wedding band, and gold earrings. Some of the Lawlors' property, taken on June 4, 2008, was recovered at the pawn shop.

Detective Henley also visited Detective Strodtman, saw hundreds of items that the DPD had seized from room 3073, and took photographs of the items. He contacted the victims of the burglaries that he was investigating to ask them to look at the photographs and possibly recognize some of the items displayed in them. Goetz, Marshall, and the Stevensons all recognized items in the photographs, retrieved the items from Dallas, and then brought the items back to Detective Henley so that he could photograph them individually.

Flower Mound Police Department Detective John Ryckeley investigated the Hernandez and Whipple burglaries. Detective Ryckeley noticed muddy shoeprints in Whipple's house and identified pictures of the shoeprints at trial. Later, through ListServ, the DPD contacted Detective Ryckeley to tell him that some of the property taken from Hernandez and Whipple may have been recovered from room 3073, and Hernandez and Whipple identified their property. After appellant's arrest, Detective Ryckeley visited him in jail, seized his Nike

shoes through a warrant, and discovered that the size and pattern on the shoes' soles matched the size and pattern of the shoeprints at Whipple's house.

**Appellant's evidence**

Rita Lara, appellant's cousin, testified that from November 2007 to April 2008, appellant lived with her at an apartment in Arlington. From November 2007 to January 2008, Lara sometimes drove appellant to Bridgeport, where he was working three to four days per week for an oil company. In early 2008, appellant stopped working, and he acquired a gray Dodge Magnum. Lara did not know where appellant resided when he stopped living with her, and she had "no idea" what he did to earn money from January until April 2008.

Appellant, who acknowledged that he had previously been convicted of three burglaries and theft, along with other offenses, testified that he worked for Express Energy in Bridgeport from August 2007 until November 2007, when he got laid off. In January 2008, he began working eighty to one hundred hours per week in Burleson for Frank's Casing Crew, and that job ended in April 2008. Working so many hours enabled him to buy the Dodge Magnum. Appellant said that in April 2008, he began living in Dallas with three other men, whom he occasionally let borrow his car.

Appellant testified that on the night of his arrest, June 10, 2008, he dropped Young off at Budget Suites at around 9 p.m. When he left the parking lot, the police stopped and arrested him. Appellant confirmed that he knew Young, and he described her as a friend. He said that he signed the lease for

14

room 3073 because Young wanted to live there but did not have valid identification, and he testified that he later tried to remove his name from the lease. Appellant claimed, however, that he never lived or spent the night there, did not have a key to the room, and did not know of any property located there.[9] He testified that Willis's testimony that he frequently went there was wrong, although he conceded that he went there to help Young buy groceries about once every three weeks.

Appellant agreed that he had sold items to a pawnshop and that those items had been taken from the burglary victims' homes, but he denied knowing or suspecting that the items had been stolen. When his counsel asked him what reasonable explanation he could give the jury about why he had possession of the items that had been stolen, he said, "The reason I had that jewelry is because Ms. Young gave it to me. She needed money, and she didn't have no I.D. And I took it over there and sold it for her. That money went directly to her."

Appellant admitted that Cecil saw him near her duplex on the day she was burglarized, and he conceded that he had tape on his license plate, but he denied committing that burglary. Instead, he said that he had driven near Cecil's duplex because he had gotten lost while looking for Young near a "big building" on Royal Lane. He testified,

---

[9]When officers searched room 3073, they did not find mail addressed to appellant and did not obtain usable fingerprints.

15

So when I didn't see Ms. Young standing anywhere, I just randomly just parked there and got out and walked and took a -- just looked around and came right back. And just as I came back to get in my car and drive off, that's when I had my encounter with Ms. Cecil.

Concerning appellant's presence at Cecil's duplex, the following exchange occurred during the State's cross-examination:

Q. Now, you understand that Ms. Cecil has testified that her house was burglarized.

A. Yes, I sure [do].

Q. And you understand that you parked in the driveway right next door to her house that was burglarized on the day that you were parked there.

A. Exactly.

Q. And you understand that the property that was stolen from her house just happened to end up in the Budget Suites room that's rented in your name.

A. Exactly. Yeah, that I understand.

Q. That's just circumstance. Right? That's just bad luck on your part, I guess.

A. Exactly.

Appellant admitted that the shoes he wore matched the tread pattern and size of prints that were found in Whipple's house, and he testified that it was also merely bad luck for that match to be coupled with the fact that the police found property from Whipple's house in room 3073.

16

Appellant denied seeing Sterett and said that Sterett had "outright lied" about his encounter with appellant in connection with the robbery of Walker's house. Appellant also denied committing each burglary described above.

**Analysis**

Appellant asserts that the State did not prove that he had entered the victims' homes or had possessed their property. But the evidence establishes that eight similarly executed burglaries, at six homes in Lewisville and two homes in Flower Mound, all occurred in less than two months. In seven of the eight burglaries, the victims identified their stolen property as the same property that the police had seized from room 3073.[10] Appellant's association with room 3073 was not exclusive, but the association enabled the jury to focus on either appellant or Young, the only people that the evidence connected to room 3073, as the burglar. Appellant contends that he did not reside with Young in that room, did not have personal belongings there, and did not possess the stolen property that the police found there. But the jury was free to reject those theories, *see Bottenfield*, 77 S.W.3d at 355, and it had rational, circumstantial reasons to do so because appellant's name was on the lease for the room, the police found men's clothes in the room upon searching it (and there is no evidence of any other male associated with that room), Willis testified that she

_____

[10]Although the police did not locate any of Walker's property in room 3073, Sterett said that he saw appellant at Walker's house on the date of that burglary, and Sterett also said that he saw a car matching appellant's Dodge Magnum on that day.

17

had seen him at the Budget Suites "[m]any times" and on a "pretty regular basis" until his arrest in June 2008, and the State impeached appellant's credibility with evidence of previous burglary convictions. *See* Tex. R. Evid. 609(a); *Woodall v. State*, 77 S.W.3d 388, 394 (Tex. App.—Fort Worth 2002, pet. ref'd).

Other facts could have allowed the jury to rationally infer that appellant, not Young, committed each of the burglaries. First, the size and pattern of appellant's shoeprints matched shoeprints found at Whipple's house. Appellant relies on *Casel v. State* to argue that the matching shoeprints are not probative, but in that case, a match between shoeprints at the scene and the shoes the defendant wore while detained for questioning was the "only evidence connecting [the defendant] with the burglary." 605 S.W.2d 609, 610 (Tex. Crim. App. [Panel Op.] 1980); *see also Harris v. State*, 163 Tex. Crim. 519, 521, 294 S.W.2d 123, 124 (1956) ("It has long been the established rule of law that, ordinarily, identity of an accused may not be established by tracks alone."). Here, the State does not rely solely on the shoeprint match to link appellant to the burglaries.

Second, Sterett testified that he had talked to appellant near Walker's residence on the date of the burglary of that house. Appellant denied this fact. Although Sterett initially told the police that appellant had missing teeth, and although Sterett had not recalled seeing tattoos on appellant's face on the day the burglary occurred, the jury had rational reasons to accept Sterett's testimony and reject appellant's testimony. For example, Sterett remembered that appellant had covered part of his license plate with duct tape, and appellant

18

conceded that he had covered the license plate in a similar way on another occasion. Also, when Officer Gehrke showed Sterett the photographic lineup, it took Sterett less than two seconds to recognize appellant. We must defer to the jury's implicit resolution of conflicts between Sterett's testimony about how appellant looked on the date of Walker's burglary and appellant's later appearance at trial. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Isassi*, 330 S.W.3d at 638.

Third, appellant's Dodge Magnum matched the car associated with Walker's burglary (by Sterett and by the Buffingtons' security recording), Stevenson's burglary, and Cecil's burglary. Fourth, the police found some of the Lawlors' property at a pawnshop in Dallas; the manager of that pawnshop testified, and appellant acknowledged, that appellant had sold property to the pawnshop. Fifth, no similar facts connected Young or anyone else to any of the burglaries. *Cf. Rollerson*, 227 S.W.3d at 725–26.

Furthermore, the jury could have rationally rejected the parts of appellant's testimony that, if believed, could have weighed against his involvement in the burglaries. *See Bottenfield*, 77 S.W.3d at 355. Although appellant said that at the time of the burglaries, he was living in Dallas with three men rather than at room 3073, none of these men corroborated appellant's testimony. The jury could have also rationally disbelieved appellant's claims that he took thirty-eight items of valuable property from Young and sold them to the pawnshop on her behalf without having any knowledge about the items being stolen and without

19

asking Young about where, when, or how she acquired the property. Finally, the jury could have rationally rejected appellant's claim that it was merely bad luck that his interaction with Cecil near her duplex coincided with her property being found in room 3073 on the same day.

Appellant asserts on appeal that the evidence shows that he did not have a key to room 3073 upon his arrest. Appellant testified that he did not have a key to room 3073, but based on the evidence described above concerning appellant's recurring presence at Budget Suites, his unloading of groceries there, and the presence of men's clothing in the room when officers searched it, the jury could have rationally rejected appellant's testimony. Also, while the State stipulated that "no set of keys was taken into the defendant's personal property when he was arrested," this stipulation does not show that appellant did not have keys when he was arrested (the evidence shows that he was driving a car). Furthermore, even if appellant did not have a key to room 3073, he still could have resided there or stored the items he had stolen there.

Contrary to the arguments in appellant's brief, the jury's verdicts of conviction do not necessarily hinge upon appellant's recent possession of stolen property. *See, e.g., Rollerson*, 227 S.W.3d at 727–28 (citing *O'Fallin v. State*, 75 Tex. Crim. 47, 50, 169 S.W. 897, 899 (1914) (op. on reh'g)); *Martin v. State*, Nos. 14-10-00440-CR, 14-10-00441-CR, 2011 WL 6916759, at *9 (Tex. App.— Houston [14th Dist.] Dec. 29, 2011, no pet. h.) (mem. op., not designated for publication) ("[T]he fact that appellant was found in possession of some of

20

Mario's property . . . was merely an additional circumstance the jury could have considered along with the other evidence outlined above when determining he committed the burglary."). Nor do the verdicts require appellant's exclusive possession of room 3073 or rest only upon the law of parties.[11]

Also, we do not agree with appellant's numerous contentions that his burglary charges rest on Young's implication of him as a co-occupant with her in room 3073. While the record shows that officers believed that they had obtained consent to search room 3073 from Young, we have not located evidence indicating that Young said anything about appellant on the night the officers searched room 3073. Moreover, without any statement by Young, the jury could have rationally linked appellant to room 3073 through Willis's testimony.

Next, appellant contends that the evidence is insufficient because there is no evidence of appellant's flight during his arrest, there were no witnesses to the entries into the habitations, appellant was not present during the search, there were no rent receipts from room 3073 with appellant's name on them, and the lease of room 3073 was not introduced as an exhibit. But the jury could have

---

[11]Nonetheless, we note that in an appropriate case, evidentiary sufficiency may be established by an application of the law of parties under section 7.02 of the penal code even if the jury charge did not contain an instruction about the law of parties. *See Garza Vega v. State*, 267 S.W.3d 912, 915 (Tex. Crim. App. 2008) ("If the hypothetically correct jury charge for the case would authorize the jury to convict on alternative theories of liability, then the appellate court must deem the evidence sufficient if it is sufficient under any of the theories of liability."); *Howard v. State*, 966 S.W.2d 821, 825 (Tex. App.—Austin 1998, pet. ref'd).

rationally found that the absence of these facts does not outweigh the probative value of the circumstantial evidence linking appellant to the burglaries. *Cf. Stevenson v. State*, 304 S.W.3d 603, 615 (Tex. App.—Fort Worth 2010, no pet.) ("The absence of the money—the purpose of the robbery—and the absence of the gun—the instrument of death according to the medical examiner's testimony—make no difference in the analysis when circumstantial evidence, by itself, can be enough to support the jury's verdict.").

Viewing all of the evidence in the light most favorable to the jury's verdicts, and deferring to the jury's authority to draw reasonable inferences from basic facts to ultimate facts, we conclude that the evidence was sufficient to enable the jury to rationally find, beyond a reasonable doubt, that appellant committed each of eight similar, linked burglaries by entering each victim's habitation to commit theft. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638; *see also Kuczaj v. State*, 848 S.W.2d 284, 287–89 (Tex. App.—Fort Worth 1993, no pet.) (holding that the evidence was sufficient to sustain the defendant's burglary conviction when he had been seen near the place of the burglary on the date of the burglary and had pawned items taken during the burglary). We overrule appellant's first two points.

### Appellant's Right to Confront Young

In his third point, appellant contends that the trial court abused its discretion by permitting Detective Mends's testimony "that inferentially or indirectly presented to the jury Mickie Young's out of court testimonial statement

22

. . . that identified appellant as a resident" of room 3073. Appellant argues that the admission of this alleged testimony violated his "constitutional right to confrontation and cross-examination" under the federal and state constitutions. *See Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004) (explaining that the Confrontation Clause of the Sixth Amendment requires the declarant's unavailability and a prior opportunity for cross-examination before an out-of-court testimonial statement may be admitted).

In the part of the record that appellant refers to in his brief, Detective Mends did not state that Young told officers anything about appellant's connection to room 3073, and we have not located any other place in the record where Detective Mends or another witness made such a statement. Instead, Detective Mends testified only that based on officers' conversations with Young, they believed that they had consent to search room 3073. When the prosecutor asked Detective Mends about the purpose of going to the Budget Suites, Detective Mends said, "I understand that the defendant had a room there, and we wanted to get into the room and figure out what was there." This statement does not indicate the source of Detective Mends's understanding about appellant's connection to the room or necessarily infer that his understanding came from the officers' conversation with Young. Thus, we disagree with appellant that Detective Mends presented an out-of-court statement by Young that connected appellant to room 3073. And even if Detective Mends had done so, appellant did not object to any of Detective Mends's testimony, and he

23

therefore forfeited any confrontation-based complaint that he had about it.[12]
*See* Tex. R. App. P. 33.1(a)(1); *Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004); *Davis v. State*, 268 S.W.3d 683, 708 (Tex. App.—Fort Worth 2008, pet. ref'd). Because the record does not support appellant's third point and because he forfeited the complaint related to that point, we overrule it.

## Appellant's Motion to Suppress

In his fourth point, appellant contends that the trial court erred by denying his motion to suppress, thus "causing these eight convictions to rest on illegally obtained evidence." Specifically, appellant argues that the police obtained evidence from an arrest that was illegal under federal and state law.

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Id.*

Before trial, appellant filed a pro se motion to suppress all evidence that was the fruit of his allegedly illegal arrest on June 10, 2008. In the motion,

---

[12]Earlier in the trial, appellant had objected to testimony about the officers' consent to search room 3073 because of his desire to confront Young about whether she had given consent. The trial court granted appellant a running objection on his confrontation complaint as related to the validity of the search, but appellant did not secure a running objection concerning any statements that Young might have made about appellant's connection to room 3073.

appellant stated that the police had conducted surveillance of Young in room 3073 after he had dropped her off at Budget Suites that night. He conceded that Young got out of his car before he was arrested, but he nonetheless asserted that the evidence that the police obtained from room 3073 after obtaining Young's consent to search it was "fruit of the poisonous tree" of his arrest.

During the hearing on appellant's motion, Detective Strodtman testified that there were active warrants for appellant's arrest on June 10, 2008, including a Tarrant County warrant for burglary, and that the arrest report showed that officers had confirmed the warrants before arresting appellant. Detective Strodtman did not, however, produce the warrants during the initial suppression hearing. He explained that officers had been instructed, based on information conveyed by Cecil and obtained from a burglary of a Dallas business, to look for appellant to be driving a 2005 Dodge Magnum with a specific license plate number.

After testimony concluded, appellant argued that his arrest was illegal because the State had not presented a valid arrest warrant. Relying on a decision from the Houston (Fourteenth District) Court of Appeals,[13] the trial court initially granted appellant's motion to suppress to the extent that the court excluded any evidence that the police obtained as a result of appellant's arrest (although the court noted that it had not seen any such evidence), but the court

---

[13]*See Weems v. State*, 167 S.W.3d 350, 358 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd), *cert. denied*, 547 U.S. 1135 (2006).

denied the motion regarding the search of room 3073 because appellant had not connected any illegality in his arrest to that search. Later on the same day as the trial court's initial suppression ruling, the State presented a certified copy of the warrant leading to appellant's arrest, which showed that the warrant was executed on June 10, 2008. Appellant objected to reopening the suppression issue on the ground that doing so would be "unfairly prejudicial." The trial court overruled appellant's objection, admitted the certified copy of the warrant into evidence, reconsidered its initial suppression ruling, and wholly denied appellant's motion to suppress.

Even if we were to hold that the trial court incorrectly reopened the suppression motion and wrongly reversed its initial decision to suppress evidence that the police obtained as a result of appellant's arrest, we would be required to determine whether the trial court's error caused harm under the standard of Texas Rule of Appellate Procedure 44.2(a). *See* Tex. R. App. P. 44.2(a); *Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001). Under that rule, the question is whether the trial court's ultimate denial of appellant's motion to suppress was harmless beyond a reasonable doubt. *See Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997). In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

If an arrest is illegal, a trial court must suppress evidence that arises from the exploitation of that illegality. *State v. Iduarte*, 268 S.W.3d 544, 551 (Tex. Crim. App. 2008). In other words, the acquisition of the evidence sought to be suppressed must be causally connected to the police's illegal act. *See id.*; *State v. Purdy*, 244 S.W.3d 591, 595 (Tex. App.—Dallas 2008, pet. ref'd).

At trial, appellant failed to establish a causal connection between his allegedly illegal arrest and the evidence that he sought to suppress through his motion. On the first full day of the trial, in a hearing outside of the jury's presence, the judge said,

> [Appellant's counsel], talk about your concern about an illegal arrest. If the arrest was illegal, what evidence did the State obtain from an illegal arrest? Because that's what I'm looking for. If there's something to suppress, any statements or any evidence from the illegal arrest, then we need to discuss that now.

Counsel responded by asserting that appellant's arrest was connected to the property found in room 3073 and by stating, "Anything found after that illegal arrest we believe should be suppressed as the fruits of an illegal arrest . . . ." The trial court again pressed counsel by asking, "What did they gain from that arrest?" Counsel mentioned the police's allegedly improper surveillance of Young[14] and referred again to the search of room 3073. Appellant's counsel later represented that no evidence was found on appellant when he was arrested, that

---

[14]Neither probable cause nor reasonable suspicion are generally necessary to authorize surveillance. *Metoyer v. State*, 860 S.W.2d 673, 678 (Tex. App.—Fort Worth 1993, pet. ref'd).

appellant had not made statements upon the arrest, and that he was moving to suppress the property found in room 3073.

The next day, at another hearing outside of the jury's presence, appellant's counsel contended that appellant had been arrested illegally and urged that "any witnesses or information or property found after that arrest be suppressed and excluded from [the] trial." He particularly asserted that items found upon the search of room 3073 should be suppressed because the police did not have probable cause to search the room and because Young, who had given consent for officers to search the room, did not appear at the trial and could not be confronted about whether the consent was voluntary.

Counsel argued that Young was a "witness that came about from the arrest of [appellant]." But counsel admitted that appellant had not given information about Young to the police, that appellant had dropped off Young at the motel prior to his arrest, and that the police had begun surveillance on the motel room and on Young before the arrest. The trial court asked counsel, "What did [appellant] give [the police] after the arrest that leads them to her that you say is fruit of the poisonous tree?" Counsel responded that appellant "didn't give them any information . . . other than he dropped her off. And I guess she became a suspect at that point by the police." On appeal, appellant concedes that he and Young were detected by officers "in the vehicle *prior to the detention and arrest* upon arriving at Budget Suites to leave Ms. Young there." [Emphasis added.]

Because the record shows that the police began surveillance of Young before appellant's arrest and obtained her consent to search room 3073 independent of the arrest, we hold that appellant failed to establish a causal connection between his arrest and the property found in room 3073. Thus, we hold that any possible error of the trial court in deciding that the arrest was legal is harmless beyond a reasonable doubt. *See* Tex. R. App. P. 44.2(a).

On appeal, appellant claims that the officers' discovery of his driver's license (which he says was used for the photographic lineups shown to Cecil and Sterett) and the police's discovery of his shoeprints were products of his arrest. But at trial, on the basis of his allegedly illegal arrest, appellant did not specifically seek to exclude anything other than the police's interaction with Young and their search of room 3073. Thus, we hold that appellant forfeited his complaint that other evidence should have been excluded. *See* Tex. R. App. P. 33.1(a); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) ("[T]he point of error on appeal must comport with the objection made at trial."); *Aguilar v. State*, 26 S.W.3d 901, 905–06 (Tex. Crim. App. 2000) (explaining that rule 33.1 requires specificity for evidentiary objections).

Finally, to the extent that appellant attempts on appeal to challenge the police's warrantless but consensual search of room 3073 on a basis that is independent of the legality of his arrest, we note that at the hearing on appellant's motion to suppress, appellant's counsel said that appellant was "not claiming standing in [the] motel room" and had no expectation of privacy in the

29

room. Appellant repeated in his testimony before the jury that he did not have an expectation of privacy in the room. Thus, appellant's challenge to the search of the room, if any, fails on the ground that he lacks standing. *See Kothe v. State*, 152 S.W.3d 54, 60 (Tex. Crim. App. 2004).

For all of these reasons, we overrule appellant's fourth point.

**The Admission of an Extraneous Offense**

In his fifth point, appellant asserts that the trial court abused its discretion by admitting evidence of Cecil's burglary, which was an extraneous offense. We review the trial court's admission of evidence under an abuse of discretion standard. *Price v. State*, 351 S.W.3d 148, 150 (Tex. App.—Fort Worth 2011, pet. ref'd); *see Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). Under this standard, the trial court's ruling will be upheld as long as it falls within the "zone of reasonable disagreement." *Karnes v. State*, 127 S.W.3d 184, 189 (Tex. App.—Fort Worth 2003, pet. ref'd), *cert. denied*, 129 S. Ct. 2391 (2009).

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." Tex. R. Evid. 404(b); *see Montgomery*, 810 S.W.2d at 387–88; *see also Segundo v. State*, 270 S.W.3d 79, 87 (Tex. Crim. App. 2008) (explaining that the defendant is generally to be tried only for the offense

30

charged, not for any other crimes), *cert. denied*, 130 S. Ct. 53 (2009). The State, as the proponent of extraneous offense evidence, bears the burden of showing admissibility. *Russell v. State*, 113 S.W.3d 530, 535 (Tex. App.—Fort Worth 2003, pet. ref'd). "Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

Appellant contends on appeal that Cecil's burglary "had no connection to this offense . . . nor presented evidence of motive, intent, plan and identity." Before Cecil testified, appellant objected to the proposed testimony on the grounds that her testimony was unfairly prejudicial and was irrelevant.[15] The State responded by arguing that Cecil's testimony would be relevant to the issues of appellant's identity and motive. The trial court overruled appellant's objection but gave the jury a limiting instruction.

"Identity is an 'elemental fact' with relevance apart from character conformity." *Booker v. State*, 103 S.W.3d 521, 530 (Tex. App.—Fort Worth 2003, pet. ref'd) (op. on reh'g).[16] For an extraneous offense to be admissible to show

---

[15]We will broadly construe appellant's relevance objection as an argument that the extraneous offense was not admissible under rule 404(b).

[16]In his brief, appellant relies on a court of criminal appeals opinion that concerned using extraneous offenses to show a common plan or scheme but did not discuss using them to prove a defendant's identity as the perpetrator of a charged offense. *See Daggett v. State*, 187 S.W.3d 444, 451–52 (Tex. Crim. App. 2005). Because we hold that Cecil's burglary was admissible to prove identity, we need not discuss how *Daggett* would have affected the admissibility of Cecil's burglary to prove a common plan.

identity, identity must be raised as an issue in the case. *Lane v. State*, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996). A defendant may raise the issue of identity during cross-examination of the State's witnesses. *Id.*; *see Page v. State*, 137 S.W.3d 75, 78 (Tex. Crim. App. 2004) ("Identity can be raised by defense cross-examination, such as when the identifying witness is impeached on a material detail of the identification."). In *Page*, the court of criminal appeals determined that the defendant raised the issue of identity because questioning of the State's witness called into doubt either "her capacity to observe (i.e., she was mistaken) or her truthfulness (i.e., she was lying), or both, [and] the questions implied that the identification of appellant was not trustworthy." 137 S.W.3d at 78.

Appellant's trial counsel asked questions during his cross-examination of Sterett that emphasized the issue of appellant's identity as the person who had committed the Walker burglary and who therefore could be linked to the other burglaries. Specifically, counsel questioned Sterett about his statement to police that appellant had missing teeth and about Sterett's failure notice appellant's tattoos. *See id.* at 78 ("We have held that the existence of a mustache can qualify as a material detail of identification."). Counsel also questioned Sterett extensively about the reliability of Sterett's choice of appellant on a photographic lineup as the man Sterett had seen near Walker's house at the time of the burglary. *See Burton v. State*, 230 S.W.3d 846, 849–50 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding that the defendant raised identity as an issue

32

by questioning the certainty of the victim's identification of him through a photographic lineup). Thus, we conclude that appellant raised the issue of his identity as the perpetrator of the eight linked burglaries. *See Segundo*, 270 S.W.3d at 86 ("The trial judge has considerable latitude in determining that identity is, in fact, disputed.").

Even when identity is raised as an issue, an extraneous offense is usually admissible only if the offense is so similar to a charged offense as to illustrate the defendant's distinctive and idiosyncratic manner of committing criminal acts. *See Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006); *see also Segundo*, 270 S.W.3d at 88 (explaining that the common characteristics to show a link between the extraneous and charged offenses may be proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements that mark both crimes as having been committed by the same person).

Cecil's burglary occurred within a month of Lawlor's, Stevenson's, Whipple's, and Hernandez's burglaries and within two months of all eight of the burglaries at issue. *See Walker v. State*, 588 S.W.2d 920, 924 (Tex. Crim. App. [Panel Op.] 1979) (holding that several extraneous offenses committed within one month of the charged offense were sufficiently similar to the charged offense so as to be admissible to prove identity). The burglary of Cecil's duplex occurred while Cecil was at work, just as had occurred in Mathis's, Goetz's, Marshall's, Hernandez's, and Lawlor's burglaries. Cecil noticed a Dodge station-wagon-like car at her house near the time of the burglary, like Sterett had seen and the

33

Buffingtons' security recording had displayed in connection with Walker's burglary, and like Stevenson had seen near his neighbor's house. When Cecil entered the duplex, she noticed that the drawers of her jewelry chest had been emptied out. Similarly, Lawlor's and Mathis's jewelry armoires, Goetz's jewelry box, and Stevenson's jewelry chest had been misplaced, and Marshall's and Whipple's jewelry had been taken. Also, Cecil's neighbor, Cooke, saw tape over a gray Dodge Magnum's license plate, just as Sterett had seen. Finally, and perhaps most importantly, property taken during Cecil's burglary, like property taken from seven of the eight burglaries at issue, was found in room 3073, which the evidence linked to appellant.

We conclude that these similarities are sufficient to sustain the trial court's decision to admit the extraneous offense of Cecil's burglary for the purpose of proving identity. *See Ransom v. State*, 503 S.W.2d 810, 813–14 (Tex. Crim. App. 1974); *Pena v. State*, 867 S.W.2d 97, 99 (Tex. App.—Corpus Christi 1993, pet. ref'd) (holding that the use of the same vehicle in the charged and extraneous burglaries was a sufficient "signature" characteristic to justify the admission of the extraneous burglary); *see also Posey v. State*, No. 05-02-00092-CR, 2003 WL 22383703, at *2 (Tex. App.—Dallas Oct. 20, 2003, no pet.) (mem. op., not designated for publication) (holding that evidence of two extraneous burglaries was admissible to show identity because, like the charged burglary, the extraneous burglaries occurred during the day, the burglar

34

ransacked the houses he had burglarized, and the burglar pawned the items he had stolen).

Appellant contends that even if evidence concerning Cecil's burglary was admissible under rule 404(b), the trial court should have excluded the evidence under rule 403. *See* Tex. R. Evid. 403 (stating that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice"). If a trial court determines that evidence of an extraneous offense has relevance aside from character conformity, and a timely, proper rule 403 objection is made, the trial court must make a balancing determination under rule 403. *Karnes*, 127 S.W.3d at 191. As we explained in *Karnes*,

> Only "unfair" prejudice provides the basis for exclusion of relevant evidence. Unfair prejudice arises from evidence that has an undue tendency to suggest that a decision be made on an improper basis, commonly an emotional one. Rule 403 favors admissibility and a presumption exists that relevant evidence will be more probative than prejudicial. In evaluating the trial court's determination under rule 403, a reviewing court is to reverse the trial court's judgment "rarely and only after a clear abuse of discretion," recognizing that the trial court is in a superior position to gauge the impact of the relevant evidence.
>
> The trial court's balancing determination must be measured against the relevant criteria by which a rule 403 decision is made. The relevant criteria in determining whether the prejudice of an extraneous offense substantially outweighs its probative value include: (1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense; (2) the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way"; (3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the

indicted offense; and (4) the force of the proponent's need for this evidence to prove a fact of consequence, that is, does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute. When the relevant criteria are viewed objectively and lead to the conclusion that the danger of unfair prejudice substantially outweighs the probative value of the proffered evidence, the appellate court should declare that the trial court erred in failing to exclude it.

*Id.* at 191–92 (citations omitted).

The admission of evidence of Cecil's burglary, through Cecil's and Cooke's testimony, made appellant's identity as the burglar of the eight homes at issue significantly more probable. Cecil testified that after leaving her job in the afternoon and arriving home, she saw a running but parked Dodge station wagon. After hearing "some thumping upstairs" and "rustling in [her] backyard," she saw appellant, who eventually got into the car and left. When she entered the house, Cecil realized that it had been burglarized. Just a few hours later, the police found Cecil's property in room 3073.

Cecil's testimony provided unique evidence of a close-in-time relationship between appellant's presence at the site of a burglary and the discovery of property, in room 3073, that was taken during the burglary. The testimony therefore significantly lessened the possibility that someone else committed Cecil's burglary and, by implication, the other burglaries associated with the items found in room 3073. For the same reason, Cecil's testimony also significantly undermined the credibility of appellant's later testimony, in which he minimized his connection with room 3073, stated that he had not been inside

36

room 3073 on the day of Cecil's burglary, claimed ignorance of the stolen nature of the property he had sold to the pawn shop, and asserted that it was merely back luck that property stolen from Cecil's house had arrived at room 3073.

Cecil's and Cooke's testimony also strengthened the credibility of Sterett's testimony. Cecil and Sterett were the only witnesses who claimed to have seen appellant at a burglary scene, and they both described his car as a gray station wagon. Cooke testified that she had noticed tape over a license plate on appellant's car, and Sterett had recalled seeing the same thing while testifying that he saw appellant and the car near the scene of Walker's burglary on the day that it occurred. As we mentioned above, appellant attacked Sterett's identification through cross-examination, and later, during appellant's own testimony, he claimed that Sterett had lied. Of the eight charged burglaries, Sterett was the only witness who claimed to have seen appellant near the crime scene, so the need for Cecil's and Cooke's testimony to support Sterett's testimony was significant.

Cooke's and Cecil's testimony comprises approximately twenty pages of the record that includes hundreds of pages of testimony from other witnesses, so it is not likely that the extraneous offense evidence distracted the jury from consideration of the indicted offenses. Finally, although we recognize that the evidence about Cecil's burglary had the potential to make an impression upon the jury of appellant's guilt for the charged burglaries, in light of our analysis

above, we conclude that the trial court could have reasonably determined that this impression was not irrational.

We conclude that the trial court did not abuse its discretion by siding with the presumption of admissibility under rule 403 and by implicitly determining that the evidence about Cecil's burglary was not substantially more prejudicial than probative. *See id.* Because we hold that the trial court did not err by admitting the evidence under rules 403 and 404(b), we overrule appellant's fifth point.

### The Cumulation of Appellant's Sentences

In his sixth point, appellant challenges the trial court's decision to order that appellant's eight sentences subject to this appeal will begin to run after the expiration of his burglary sentence from Dallas County. In the first part of his sixth point, appellant argues that the evidence is "insufficient to prove the prior offense alleged in the State's motion to cumulate." Specifically, he contends that the State did not present a certified copy of his previous conviction or expert testimony to identify him as the same person convicted in Dallas County.

Under article 42.08 of the code of criminal procedure,

> When the same defendant has been convicted in two or more cases, judgment and sentence shall be pronounced in each case in the same manner as if there had been but one conviction. . . . [I]n the discretion of the court, the judgment in the second and subsequent convictions may either be that the sentence imposed . . . shall begin when the judgment and the sentence imposed . . . in the preceding conviction has ceased to operate, or that the sentence imposed . . . shall run concurrently with the other case or cases . . . .

Tex. Code Crim. Proc. Ann. art. 42.08(a) (West Supp. 2011).

38

"The Legislature has assigned the task of cumulating sentences exclusively to the trial judge. . . . [W]hen a trial judge lawfully exercises the option to cumulate, that decision is unassailable on appeal." *Beedy v. State*, 250 S.W.3d 107, 110 (Tex. Crim. App. 2008) (citations and footnotes omitted). For an order cumulating sentences to be valid, however, the record must sufficiently link the defendant to the prior conviction. *See Miller v. State*, 33 S.W.3d 257, 259–61 (Tex. Crim. App. 2000). "[A]n admission by a defendant [is] sufficient evidence to link the defendant to his prior convictions." *Id.* at 262.

Before trial, the State filed a "Motion for Cumulative Sentences," stating that appellant had been previously convicted of burglary in cause number F-0856627 in the "7th Criminal District Court" in Dallas County in February 2009. During the middle of the trial, while making an objection to Cecil's testimony, appellant's counsel said,

> Your Honor, we'd object on this witness being called. She was the homeowner, complaining witness, in a case Mr. Mejia went to trial on February 16th, 2009, in Dallas on Cause No. F0856627-Y in the Criminal District Court No. 7. *He was convicted and given a 50-year sentence.*

The trial court's judgments state that the eight sentences at issue shall commence "when the sentence imposed in Cause No. F-0856627, in Dallas County, Texas, ceases to operate."

We conclude that appellant's counsel's admission sufficiently linked him to the conviction for which the State sought cumulation, and we overrule that part of

39

his sixth point. *Id.* at 262; *see also Mungaray v. State*, 188 S.W.3d 178, 183–84 (Tex. Crim. App. 2006).

Next, appellant contends that cumulation was improper because the eight burglaries at issue occurred in the same criminal episode as the Dallas County burglary. Section 3.03 of the penal code limits the trial court's discretion to cumulate sentences. *See* Tex. Penal Code Ann. § 3.03 (West Supp. 2011). Under that section, sentences must generally run concurrently when "the accused is found guilty of more than one offense arising out of the same criminal episode *prosecuted in a single criminal action*." Tex. Penal Code Ann. § 3.03(a) (emphasis added); *see Reese v. State*, 305 S.W.3d 882, 885 (Tex. App.—Texarkana 2010, no pet.) (explaining that "single criminal action" refers to a single trial or plea proceeding and that proper cumulation of sentences may occur for offenses that are not tried in a single criminal action); *see also Martin v. State*, No. 02-08-00128-CR, 2009 WL 2414294, at *8 (Tex. App.—Fort Worth Aug. 6, 2009, no pet.) (mem. op., not designated for publication) ("[T]he trial court did not err by failing to have the sentence from Martin's DWI-misdemeanor repetition conviction run concurrently with his conviction for failure to stop and render aid because the two convictions were tried in separate criminal actions.").

Even if we were to hold that the eight burglaries at issue occurred in the same criminal episode as the Dallas County burglary, because they were not tried in the same criminal action as the Dallas County burglary, we conclude that

section 3.03(a) did not restrict the trial court's discretion to cumulate. *See* Tex. Penal Code Ann. § 3.03(a); *Reese*, 305 S.W.3d at 885.

For these reasons, we overrule appellant's sixth point.

## Conclusion

Having overruled each of appellant's points, we affirm the trial court's judgments.

PER CURIAM

PANEL:  LIVINGSTON, C.J.; WALKER and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  February 23, 2012